**TRANSAMERICA LEASING, INC., et al., Appellees,**

v.

**LA REPUBLICA DE VENEZUELA and Fondo de Inversiones de Venezuela, Appellants.**

No. 98–7206.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 13, 1999.

Decided Jan. 21, 2000.

Rehearing and Rehearing En Banc Denied March 8, 2000.*

---

* Circuit Judge Garland did not participate in this matter.

Alexander E. Bennett argued the cause for appellants. With him on the briefs were Mark H. Stumpf, Steven G. Reade, Jean E. Kalicki, and Beth R. Kallet.

John E. Bradley argued the cause for appellees. With him on the brief were Benjamin P. Deutsch, and Lisa M. Cobb. Cherie B. Artz entered an appearance.

Before: GINSBURG, HENDERSON, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Twelve companies that leased equipment to the now defunct Compañia Anonima Venezolana de Navegación (CAVN), a shipping company owned by the Republic of Venezuela, brought suit against Venezuela and the Fondo de Inversiones de Venezuela (FIV), an instrumentality of the Venezuelan government created to assist in restructuring and privatizing state enterprises. The first three counts of the complaint allege that Venezuela and the FIV are derivatively liable for CAVN's breaches of contract. The final count alleges that Venezuela and the FIV are di-

rectly liable for having caused CAVN to breach its contracts with the plaintiffs.

In this interlocutory appeal, Venezuela and the FIV argue that they are immune from suit upon all counts under the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. § 1602 *et seq.*, and that they are immune from suit upon the fourth count under the "act of state" doctrine as well. We hold that because they did not exercise the requisite control over CAVN, Venezuela and the FIV are indeed immune from suit upon the first three counts. We remand the case for the district court to consider in the first instance whether the defendants are immune from suit upon the fourth count.

## I. Background

Although the parties vigorously dispute many details of the relationship between CAVN and the defendants, the basic facts underlying this case are uncontested. CAVN was an international shipping company created in 1917 by Venezuela and operated as a state-owned instrumentality until it filed for bankruptcy in 1994. At all relevant times, the FIV, known under Venezuelan law as an "autonomous institute," owned 99.86% of CAVN's stock and Venezuela, through various ministries, owned the remainder. The plaintiffs are twelve corporations that leased to CAVN shipping equipment, such as containers and chassis, between 1982 and 1993.

In the early 1990s CAVN began experiencing severe financial trouble, in part because of the inefficient way in which it handled leased equipment. In September 1991 the FIV, concerned about CAVN's mounting losses, commissioned the consulting firm Booz, Allen & Hamilton, Inc. to assess CAVN's financial health and operating procedures. Booz Allen recommended that CAVN restructure its operations, upgrade its fleet, overhaul its handling of leased equipment, and in general strengthen its management.

In 1992 CAVN requested financial assistance from the FIV, which referred the request to the Sectoral Cabinet for Economic and Social Policy Issues, an organization that by law must approve all such requests before the FIV may act. The Cabinet approved CAVN's request conditioned upon CAVN's agreement to restructure. When CAVN agreed to that condition, the FIV commissioned Booz Allen to prepare a restructuring plan. The FIV made funds available to CAVN through a trust agreement under which the FIV is both settlor and trustee and CAVN is the beneficiary. Under the agreement, CAVN had to place some of its assets in trust with the FIV as collateral.

Notwithstanding these efforts, CAVN began to fall behind in its lease payments and in 1993 the plaintiffs issued notices of default and termination. In November 1993 CAVN and the lessors agreed to restructure CAVN's payments; until January 1994 the FIV provided additional capital infusions to allow CAVN to meet the restructured payment schedules. In April 1994 the lessors again agreed to restructure CAVN's payments. By July, however, CAVN was unable to continue operations: it filed for bankruptcy in October 1994.

In June 1997 the plaintiffs brought this suit against the Republic of Venezuela and the FIV (henceforth referred to collectively as "Venezuela" or "the Government"). In the first three counts of the complaint they allege that Venezuela used CAVN as its "alter ego," or as its "agent," or that it cloaked CAVN with apparent authority to bind the Government, and that Venezuela is therefore liable upon the lease agreements and restructured payment schedules. In the final count the lessors allege that Venezuela, by refusing to continue providing funds to CAVN, caused CAVN to breach its contracts with the plaintiffs. Venezuela moved to dismiss the complaint in January 1998, claiming that under the FSIA it is immune from suit upon all counts and that suit upon the fourth count is precluded under the act of state doctrine as well.

The district court denied Venezuela's motion to dismiss. Based upon the pleadings and the extensive evidence submitted supporting and opposing the motion, the district court found that Venezuela, which had appointed the Board, exerted extensive control over CAVN's everyday operations, played a major role in CAVN's financial restructuring, and appeared to have authorized CAVN to act on its behalf. From these findings the district court concluded both that CAVN had in fact acted as the Government's agent, and that it had apparent authority to act for the Government, in its dealings with the plaintiffs, and therefore that Venezuela is amenable to a suit based upon the activities of CAVN. The court did not discuss the final count of the complaint, in which the plaintiffs seek to hold Venezuela liable for causing CAVN to breach its contracts, and with respect to which the Government raises the act of state objection.

## II. Analysis

Venezuela filed this interlocutory appeal in order to press its claim of immunity from suit. Under the FSIA a "foreign state [is] immune from the jurisdiction of the courts of the United States and of the States," subject to certain enumerated exceptions. 28 U.S.C. § 1604. For this purpose, "foreign state" includes any "agency or instrumentality" thereof. 28 U.S.C. § 1603(a). Both Venezuela and the FIV are immune from suit upon the plaintiffs' claims, therefore, unless those claims fall within one of the listed exceptions. The plaintiffs contend that their claims are within the "commercial activity" exception, which provides that:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

 \* \* \* \* \* \*

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere;

or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

28 U.S.C. § 1605(a)(2).

Venezuela implicitly concedes that the first three counts of the complaint are based upon "commercial activities" within the meaning of 28 U.S.C. § 1605(a)(2), but maintains that it is not amenable to a suit based upon the commercial activities of CAVN because CAVN was not its agent. As to the final count, Venezuela argues first that the activities alleged there are not "commercial activities," and second that they are acts of state for which the Government is immune from trial in any event.

■■■ The district court's denial of a foreign state's motion to dismiss upon the ground of sovereign immunity is subject to interlocutory appeal under the collateral order doctrine. See *Foremost–McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C.Cir.1990) (citing *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 545–47, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)). We review the district court's findings of fact for clear error, see *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1028 (D.C.Cir. 1997), and in this case we find none. We review *de novo* the district court's determination that Venezuela is not entitled to immunity, see *id.*, to which task the balance of this opinion is devoted.

### A. Subject matter jurisdiction, Counts I–III

■■ A government instrumentality "established as [a] juridical entit[y] distinct and independent from [its] sovereign should normally be treated as such"; thus, it is presumed to have legal status separate from that of the sovereign. *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 627, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (*Bancec*). That presumption can be over-

come in two situations: First, "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created," *id.* at 629, 103 S.Ct. 2591 (citing *NLRB v. Deena Artware, Inc.,* 361 U.S. 398, 402–04, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960)); and second, where recognition of the instrumentality as an entity apart from the state "would work fraud or injustice." *Id.* (citing *Taylor v. Standard Gas & Electric Co.,* 306 U.S. 307, 322, 59 S.Ct. 543, 83 L.Ed. 669 (1939)). Although the Supreme Court in *Bancec* recognized these as exceptions to the rule that a foreign sovereign is not liable for the acts of an instrumentality of the state, we have since held that they serve also as exceptions to the rule that a foreign sovereign is not amenable to suit based upon the acts of such an instrumentality. *See, e.g., Foremost–McKesson,* 905 F.2d at 446–47. Accordingly, the present plaintiffs argue both reasons—agency and injustice—for holding that Venezuela is amenable to suit based upon the activities of CAVN.

### 1. The agency exception: Principles

Our previous decisions applying the agency exception to the rule of sovereign immunity have generally focused upon how much control the sovereign exercised over the instrumentality, without explicating why and the circumstances in which control is relevant to the question of the sovereign's amenability to suit. *See, e.g., McKesson Corp. v. Islamic Republic of Iran,* 52 F.3d 346, 352 (1995). Control by the sovereign is relevant in two distinct contexts, as discussed below.

#### a. Control

■ First, control is relevant when it significantly exceeds the normal supervisory control exercised by any corporate parent over its subsidiary and, indeed, amounts to complete domination of the subsidiary. A sovereign is amenable to suit based upon the actions of an instrumentality it dominates because the sovereign and the instrumentality are in those circumstances not meaningfully distinct

entities; they act as one. Indeed, in the case cited by the Supreme Court to illustrate the agency exception, various corporations were allegedly operated as a "single enterprise." *See NLRB v. Deena Artware, Inc.,* 361 U.S. 398, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960).

In that case, the NLRB had ordered an employer to offer reinstatement and backpay to former employees. *See id.* at 399, 80 S.Ct. 441. Although the employer initially complied with the order, it soon ceased operations without having paid back wages. *See id.* The employer was, however, only one of several wholly-owned subsidiaries of the same parent corporation. *See id.* at 399–400, 80 S.Ct. 441. The Board petitioned the court of appeals to hold not only the subsidiary employer but also its parent and the sister subsidiaries in civil contempt. The Board proceeded in part upon the theory that the various corporations were operated as a "single enterprise" with each performing "a particular function, as a department or division of the one enterprise in the manufacture, sale and distribution of the common product." *Id.* at 401, 80 S.Ct. 441. The court of appeals dismissed the petition but the Supreme Court reinstated it and granted the Board discovery on the "single enterprise" issue. *Id.* at 404, 80 S.Ct. 441.

In the course of reaching that decision, the Supreme Court offered numerous examples of situations where one company so dominated another that the courts held the controlling company liable for the obligations of the controlled company. Thus, if one corporation is "operated as a division of another," then the latter may be held responsible for the acts of the former. *Id.* at 403 & n. 2, 80 S.Ct. 441 citing, for example, *Joseph R. Foard Co. v. Maryland,* 219 F. 827, 829 (4th Cir.1914) (involving subsidiary that did not handle any funds and paid all profits to parent "as a charge for managing the business"), and *Dillard & Coffin Co. v. Richmond Cotton Oil Co.,* 140 Tenn. 290, 293–94, 204 S.W. 758 (1918) (involving parent that could at

any time dismiss subsidiary's Board of Directors and appoint new directors of its choosing, that received "daily reports ... of each transaction" consummated by subsidiary, and that paid financial obligations of subsidiary). Or the "affairs of the group may be so intermingled that no distinct corporate lines are maintained." *Id.* at 403 & n. 4, 80 S.Ct. 441, citing, for example, *The Willem Van Driel, Sr.,* 252 F. 35, 37 (4th Cir.1918) (involving railroad that dictated subsidiary elevator company's clients, appointed own officers to run elevator company, controlled elevator company's accounts, and used elevator company's profits for its own purposes). In addition, a parent corporation may be held liable for the acts of a subsidiary that is a "shell, inadequately financed." *Id.* at 403 & n. 3, 80 S.Ct. 441, citing, for example, *Luckenbach S.S. Co. v. W.R. Grace & Co.,* 267 F. 676, 681 (4th Cir.1920) (involving subsidiary that was undercapitalized, issued 94% of its stock to owner of parent, leased equipment from parent at "far below ... rental value," and was "personally managed" by owner of parent).

■ Second, control is relevant when the sovereign exercises its control in such a way as to make the instrumentality its agent; in that case control renders the sovereign amenable to suit under ordinary agency principles. *See Gilson v. Republic of Ireland,* 682 F.2d 1022, 1026 n. 16, 1029 (D.C.Cir.1982) ("An agent's actions may provide the basis for jurisdiction over the principal"). The relationship of principal and agent depends, however, upon the principal having "the right to control the conduct of the agent with respect to matters entrusted to [the agent]." RESTATEMENT (SECOND) OF AGENCY § 14 (1958).

■ A sovereign does not create an agency relationship merely by owning a majority of a corporation's stock or by appointing its Board of Directors. *See Foremost–McKesson,* 905 F.2d at 448; RESTATEMENT (SECOND) OF AGENCY § 14M. If majority stock ownership and appointment of the directors were sufficient, then the presumption of separateness announced in *Bancec* would be an illusion. At the same time, a sovereign need not exercise complete dominion over an instrumentality—to the point of stripping it of any meaningful separate identity—in order to establish a relationship of principal and agent. If such domination were required, then agency principles would be superfluous because, as discussed above, the sovereign would be subject to suit on the ground that instrumentality and sovereign were in fact a single entity.

■ Courts have long struggled, often with confusing results, to explain how much control is required before parent and subsidiary may be deemed principal and agent. *Cf. Berkey v. Third Avenue Railway Co.,* 244 N.Y. 84, 155 N.E. 58, 61 (1926) ("The whole problem of the relation between parent and subsidiary corporations is one that is still enveloped in the mists of metaphor"); RESTATEMENT (SECOND) OF AGENCY § 14M reporter's notes ("When liability is fastened upon the parent it is said that the subsidiary is a 'mere agent' [which has resulted in] a weakening and muddying of the term 'agent' and a failure by courts to state the real reasons for their decisions"). The question defies resolution by "mechanical formula[e]," for the inquiry is inherently fact-specific. *See Bancec,* 462 U.S. at 633, 103 S.Ct. 2591. At a minimum, however, we can confidently state that the relationship of principal and agent does not obtain unless the parent has manifested its desire for the subsidiary to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors. *See* RESTATEMENT (SECOND) OF AGENCY § 1 ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and sub-

ject to his control, and consent by the other so to act").

■ That a state and a state-owned corporation may in some circumstances be, respectively, principal and agent does not necessarily mean, however, that in those circumstances the sovereign is amenable to a suit based upon the acts of the agent. For example, "jurisdiction [over the sovereign] cannot be maintained if the agent's actions are not related to the substance of plaintiff's cause of action." *Gilson,* 682 F.2d at 1029–30. Nor, under principles of agency, is a sovereign amenable to suit upon a contract that its agent made on its own account though, unbeknownst to the contracting plaintiff, the sovereign had authorized the agent to make the contract on the sovereign's behalf. *See* RESTATEMENT (SECOND) OF AGENCY § 199.

### b. Apparent authority

■ A plaintiff might contend that a corporation, even if not an agent of the sovereign, had apparent authority to act on the sovereign's behalf. In that case the plaintiff would have to show that it reasonably relied upon a manifestation by the sovereign to that effect. *See* RESTATEMENT (SECOND) OF AGENCY § 27 ("[A]pparent authority to do an act is created as to a third person by [a manifestation] of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him"); *see also* RESTATEMENT (SECOND) OF AGENCY § 27 cmt. d (explaining that a manager "has apparent authority to do those things which managers in that business . . . customarily do"); RESTATEMENT (SECOND) OF AGENCY § 159 & cmt. b; RESTATEMENT (SECOND) OF AGENCY § 8 & cmt. a. For example, if a sovereign falsely represented to a third party that an instrumentality of the state was authorized to act as the sovereign's agent and the third party reasonably relied upon that representation when contracting with the instrumentality, then under agency principles the third party could sue the sovereign upon the contract under a theory of apparent authority

even though the sovereign and the instrumentality were not, in fact, related as principal and agent. *See, e.g.,* RESTATEMENT (SECOND) OF AGENCY § 8 cmt. a, illus. 3. We doubt, however, that a case of merely apparent authority falls within the agency exception—an exception limited by its terms to situations in which the instrumentality "is so extensively controlled by [the sovereign] that a relationship of principal and agent is created." *Bancec,* 462 U.S. at 629, 103 S.Ct. 2591. (Still, in an appropriate case a court might attribute the acts of the instrumentality to the sovereign under the exception for fraud or injustice).

### 2. The agency exception: Application

With these background principles in mind, we turn to the facts of the case at bar. Recall that the district court denied Venezuela immunity under the FSIA based upon its conclusions that CAVN was an agent of the State and that CAVN had apparent authority to act for the State. Upon appeal, the plaintiffs also seem to argue that Venezuela so dominated CAVN as to deprive it of separate juridical identity.

### a. Control

■ In our view, the plaintiffs, whether understood to contend that Venezuela so dominated CAVN that the corporation lacked a distinct identity, or merely that CAVN acted as the Government's agent, have failed to demonstrate that Venezuela controlled CAVN to a degree sufficient to render the State amenable to suit based upon the actions of the corporation.

The district court focused upon five facts that led it to attribute the actions of CAVN to the Government: Venezuela (1) owned a majority of CAVN's stock; (2) appointed the Board of Directors and the Chairman of the Board and President; (3) was involved in CAVN's "day-to-day" operations by overseeing the restructuring of CAVN's intermodal operations and approving the sale of three of CAVN's vessels; and (4) aided CAVN financially by

allowing the FIV to enter into a trust agreement with CAVN; while (5) the President of CAVN, with apparent authority to bind Venezuela, assured one of the plaintiffs that the Government would support CAVN. Before this court, the plaintiffs press these considerations as support for both their domination and their agency theories of the case.

In our view however, the facts as found, considered as a whole, establish neither that Venezuela dominated CAVN nor that CAVN was Venezuela's actual or apparent agent. The first two facts—that the Government owned CAVN's stock and could appoint CAVN's Board of Directors and the Chairman and President—are relevant but as a matter of law do not by themselves establish the required control, see *Foremost–McKesson,* 905 F.2d at 448, and the remaining factors do not make up the shortfall.

■■■ As for the third fact, the Government's purported role in CAVN's "day-to-day operations," the district court found that "CAVN's Board of Directors appointed Captain Antonio Romero Sierraalta, a maritime professional and officer in the Venezuelan Navy, with full power and authority, to head a new Intermodal Division," and that the Board directed him to implement Booz Allen's recommendations for restructuring. After describing the extensive changes Capt. Sierraalta made in that managerial capacity and noting that " 'the [B]oard of [Directors] was aware of [the] details ...' of these efforts," the district court concluded that the Government, "through the appointment of Capt. Sierraalta, effectively commandeered the principal intermodal operations of CAVN." These findings, however, describe nothing more than the sole shareholder exercising its influence, through the Board of Directors, to put its own chosen manager in charge of a corporation that was suffering severe operational problems—and leaving to him the task of running "day-to-day" operations. If that were enough to make the shareholder answerable for the acts of the corporation, then the holding of *Fore-*

*most–McKesson* that majority stock ownership and control over the Board of Directors are insufficient to transform parent to principal and instrumentality to agent would be limited to cases in which the shareholder is utterly quiescent; let it exert itself at all to protect its interests and it loses its legal identity separate from that of the corporation. That is not the law. *See, e.g.,* RESTATEMENT (SECOND) OF AGENCY § 14M.

The court also found that the Government was involved in CAVN's "day-to-day" operations because "the Economic Department for the Sector, an agent of ... Venezuela, authorized the sale of [three] of CAVN's vessels." This finding adds no support for the proposition that Venezuela exercised the requisite control over CAVN. First, the sale of a portion of its fleet as part of a massive restructuring hardly qualifies as CAVN's "day-to-day" business. Second, it is not uncommon for a government—as regulator, not as shareholder— to require approval for certain transactions in the transportation sector. *See, e.g.,* 49 U.S.C. § 11323(a)(2)(requiring that the Surface Transportation Board approve a "purchase, lease, or contract to operate property of another rail carrier"); 46 App. U.S.C. § 1704(a) (giving Federal Maritime Commission jurisdiction over certain agreements among "ocean common carriers"). Because the record evidence cited by the district court in support of its finding is somewhat cryptic, it is unclear why the Department for the Sector approved the sale of the ships and even whether its approval was required. There is at least some evidence in the record that Venezuela generally regulates the sales of vessels. Without more, we cannot say that requiring a shipping company to obtain governmental approval for the sale of vessels represents the exercise of Venezuela's authority as shareholder rather than its exercise of governmental power in the ordinary course of regulation.

Finally, the district court considered the Government's "financial involvement" with

CAVN. The court found that CAVN's counsel, in a letter to the United States Federal Maritime Commission, had "acknowledged that the operating assets of CAVN were owned and controlled by . . . Venezuela." In context, however, that statement is utterly innocuous. The letter was sent in response to a request from the FMC for information, which included the following question:

Are your operating assets directly or indirectly owned or controlled by a government under whose registry any of your vessels operate? . . . For purposes of this question, ownership or control is deemed to exist if a majority interest in the carrier, or its operating assets, is owned or controlled in any manner by a government . . . or entity controlled by such government.

Counsel answered the question by stating, "Yes, the Republic of Venezuela," which he had to do simply because "a majority interest in the carrier . . . [was] owned by [the] government" of that country. As we have seen, however, mere ownership does not imply control of the sort that could render the Government amenable to suit based upon the acts of the corporation.

Also under the heading of financial involvement, the district court found that Venezuela had "decided to inject funds into CAVN as part of the restructuring plan" and that the FIV had entered into the trust agreement with CAVN so that CAVN could "satisfy its debts and attain liquidity." Far from demonstrating that Venezuela and the FIV exercised the type of control over CAVN that would justify attributing the corporation's actions to them, the facts as found reflect only a normal relationship between a sovereign and an instrumentality of the state. Indeed in *Bancec* the Court noted that a "typical government instrumentality" has primary responsibility for its own finances "[e]xcept for appropriations to provide capital or to cover losses." *Bancec,* 462 U.S. at 624, 103 S.Ct. 2591. In other words, the infusion of state capital to cover CAVN's losses was a normal aspect of the relation between a government and a gov-

ernment-owned corporation, not an instance of "day-to-day" involvement in the affairs of the corporation, and hence does not tend to justify stripping Venezuela of its sovereign immunity.

The other findings marshaled by the district court as evidence of the Government's involvement in CAVN's financial affairs similarly demonstrate only that Venezuela provided funds to CAVN in order to reorganize the ailing company and to bail it out of debt. Taken together, the district court's findings do not show that Venezuela controlled CAVN in a manner sufficient to forfeit its immunity under the FSIA.

The plaintiffs direct our attention to still other evidence in the record that was not the subject of the district court's findings—and all of which the defendants contest—that they claim justifies attributing CAVN's actions to Venezuela. We will neither rehearse nor resolve these disputes here. Viewing the disputed facts favorably to the plaintiffs, however, we remain unconvinced that Venezuela exercised such control over CAVN as to make the Government amenable to suit based upon CAVN's actions under the principal and agent exception announced in *Bancec.*

Our decision in *Foremost–McKesson,* contrary to the plaintiffs' argument, does not indicate a different result. *Foremost–McKesson* involved a suit brought by American holders of a minority interest in an Iranian dairy against the Government of Iran and several instrumentalities thereof. The shareholders alleged that Iran had acted through its instrumentalities unlawfully to divest them of their equity in the dairy. *See McKesson,* 52 F.3d at 348. We affirmed both the district court's conclusion that the instrumentalities had acted as agents of Iran in divesting the plaintiffs of their equity and its holding that the acts of the instrumentalities were attributable to Iran, which was not, therefore, immune from the suit under the FSIA. *See id.* at 352.

Although the district court had made extensive findings detailing Iran's pervasive control over the instrumentalities, we focused upon four facts. First, the instrumentalities owned a majority of the dairy's stock and controlled six of the seven seats on its Board of Directors. *See id.* at 351. Second, the Government of Iran had issued anti-American policy statements to the instrumentalities, which they reasonably believed the Government wanted them to carry out in their dealings with the dairy's American shareholders. For example, the Managing Director of one of the instrumentalities, who eventually chaired the dairy's Board of Directors, stated that the dairy "was no longer a 'joint stock company' whose primary fiduciary duty was to its stockholders" and declared it the dairy's "main objective ... to protect the interests of the country." *Id.* at 351. Third, Iran directly controlled "[r]outine business decisions, such as declaring and paying dividends to shareholders and honoring the dairy's contractual commitments"; indeed, the dairy's Board of Directors had "deferred [their] decision to withhold dividends from [one of the American shareholders]" until they had received approval from "Iran's Cabinet Ministers (and officials answerable to them)." *Id.* at 351–52. Finally, we emphasized that the dairy had not "simply carr[ied] out a state commercial policy as a normal part of the corporation's mission, without any state involvement" but instead had acted to effectuate a governmental policy "designed to injure some of the corporation's own shareholders ... through a corporate policy guided by government representatives." *Id.* at 352.

Beyond the features inherent in a state-owned corporation, namely the government's ownership of stock and control of the Board of Directors, this case bears no resemblance to *McKesson.* Venezuela did not evince an intent to have CAVN act as its agent in dealing with the plaintiffs. No one at CAVN sought the Government's approval for routine business decisions. In short, *McKesson* is to this case what

the *Chicago Manual of Style* was to e.e. cummings: not controlling.

### b. Apparent authority

The district court next considered whether Venezuela had indicated to the plaintiffs that CAVN could act as its agent, that is, whether Venezuela had apparently given CAVN authority to act for it. Upon appeal the plaintiffs also pursue this theory in support of the district court's holding.

▮ In reaching the conclusion that CAVN had apparent authority to bind the Government, the court found that Vice Admiral Efraim Diaz Tarazón of the Venezuelan Navy, who also served for a time as President and Chairman of the Board of CAVN, had assured one of the plaintiffs—while wearing his naval uniform, no less—that "Venezuela would support CAVN." This finding, which is the only support for the district court's conclusion that Venezuela had cloaked CAVN with apparent authority, is insufficient to render the State liable for the acts of the corporation. Appointing Tarazón as President of CAVN certainly cloaked him with authority to bind CAVN, see RESTATEMENT (SECOND) OF AGENCY § 27 cmt. d, above, but something more would be required before a creditor of CAVN could reasonably infer that Tarazón was thereby authorized to bind the Government. Tarazón's decision to dress as an Admiral when he met with one of the lessors is just that—Tarazón's sartorial decision—not an indication coming from the Government that it had authorized him to commit government funds outside the normal channels running through the Cabinet and the FIV. In the absence of any evidence of such an authorization from the Government, we reject the plaintiffs' argument that CAVN had apparent authority to bind Venezuela.

### 3. The exception for fraud or injustice

▮ We turn now to the exception for fraud or injustice recognized in *Bancec.* 462 U.S. at 629, 103 S.Ct. 2591. Although

the district court did not address it, the plaintiffs argue in passing that this exception, too, applies to this case. Their theory, in a nutshell, is that the "[d]efendants' failure to adequately provide CAVN with the financial resources and the basic tools necessary to run a commercial shipping line and to perform its contracts with and commitments to" the plaintiffs "provides an independent basis to attribute CAVN's commercial activities to the [d]efendants for FSIA purposes." The plaintiffs cite two cases for support, but neither is of any help to them.

In *Anderson v. Abbott*, 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793 (1944), the Supreme Court dealt with a suit against some of the shareholders of a bank holding company, 321 U.S. at 354, 64 S.Ct. 531, the only substantial asset of which was stock in its subsidiary banks. *Id.* at 358, 64 S.Ct. 531. By statute, stock in the banks carried "double liability," meaning that both the banks and their shareholders were liable to the depositors. *Id.* at 358–59, 64 S.Ct. 531. The Court held the shareholders of the holding company liable for the depositors' claims against the subsidiary banks because allowing the holding company to insulate them "would allow stockholders of banks to retain all of the benefits of ownership without the double liability which Congress had prescribed." *Id.* at 358, 64 S.Ct. 531.

Here, in contrast to *Abbott*, the sovereign shareholder of CAVN did not use the corporation to defeat any statutory policy of either Venezuela or the United States. Nor was CAVN, unlike the holding company in *Abbott*, thinly capitalized from its inception—a fact relevant to the fraud or injustice exception later given separate recognition in *Bancec*. These two critical differences render *Abbott* inapplicable to the case at bar.

In *Hystro Products, Inc. v. MNP Corporation*, 18 F.3d 1384 (7th Cir.1994), the plaintiff brought suit under state law against the parent of a corporation that had not paid it for certain goods before ceasing operations. *See id.* at 1386–87.

The jury, finding that the subsidiary was the "alter-ego" of the parent, awarded damages to the plaintiff. *Id.* The court of appeals affirmed on the grounds that a reasonable jury could have concluded both that the parent and its subsidiary had not maintained their "separate identities," *see id.* at 1390, and that the parent "allowed [its subsidiary] to continue to place orders knowing that it would 'stiff' [the plaintiff] on the final bill." *Id.* at 1392.

*Hystro Products* is inapplicable to the present case for two reasons. First, while the parent in *Hystro Products* dominated its subsidiary, the plaintiffs here, as we have seen, have not shown that Venezuela dominated CAVN. Second, in *Hystro Products* there was evidence that the parent had planned for months to shut down its subsidiary and had neither told the plaintiff of those plans nor otherwise indicated that the subsidiary was having financial difficulty. The jury therefore reasonably could have concluded that the parent had used its subsidiary unjustly to obtain goods for which it had no intention of paying. Here, Venezuela did not manipulate CAVN in order to obtain a financial benefit from the plaintiffs before CAVN went bankrupt; it simply failed in the end to bail CAVN out. The Government's extensive but ultimately unsuccessful efforts to save CAVN from bankruptcy are a far cry from the fraud involved in *Hystro Products*.

We therefore hold that Venezuela is not amenable to suit upon the first three counts of the plaintiffs' complaint under the fraud or injustice exception. Those counts are dismissed.

## B. Subject matter jurisdiction, Count IV

In the final count of the complaint the plaintiffs allege that Venezuela caused CAVN to breach its contracts with them by "failing to restore CAVN's accumulated deficits and by refusing to allow CAVN to fully perform its obligations under the Equipment Lease Agreements and the restructuring and repayment plans." Vene-

zuela contends both that the FSIA and the act of state doctrine protect it from suit upon this count. The district court did not address either assertion.

 In light of our dismissal of the first three counts of the complaint, and of the district court's failure to discuss the final count, we leave to the district court in the first instance the question whether Venezuela and the FIV are, by reason of the FSIA, immune from suit upon the final count. We do not reach Venezuela's act of state defense because it is not properly subject to interlocutory appeal. *See Walter Fuller Aircraft Sales, Inc. v. Republic of the Philippines,* 965 F.2d 1375, 1387 (5th Cir.1992). The act of state doctrine is a substantive rule of law that precludes the district court from inquiring into the legality of a sovereign's public acts; it is not strictly an immunity from suit. *See id.*

 Although Venezuela has asked this court to exercise pendent jurisdiction over the act of state issue, we decline to do so. We exercise such jurisdiction "sparingly" and not so as to "reach[ ] an issue that might be mooted or altered by subsequent district court proceedings." *Gilda Marx, Inc. v. Wildwood Exercise, Inc.,* 85 F.3d 675, 678, 679 (D.C.Cir.1996). Because the district court is yet to determine whether Venezuela is immune from suit upon count four pursuant to the FSIA, we will not rush in to resolve the act of state issue at this juncture.

### III. Conclusion

For the forgoing reasons, the first three counts of the complaint are dismissed. We remand this matter to the district court to consider whether the defendants are immune under the FSIA from suit upon the fourth count of the complaint, and if not, then to take up Venezuela's act of state defense.

*It is so ordered.*