O’SCANNLAIN, Circuit Judge,
dissenting,
with whom KÓZINSKI, Chief Judge, and RAWLINSON, Circuit Judge,
join:
Because I am not persuaded that an instrumentality of the Republic of Austria may be subjected to the jurisdiction of the United States Courts on the basis of the facts alleged in this case, I must respectfully dissent from the decision of the en banc court to the contrary.
I
The Foreign Sovereign Immunities Act of 1976 (FSIA) is “the sole basis for obtaining jurisdiction over a foreign state in our courts.” Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). Under the FSIA, a foreign state is presumptively “immune from the jurisdiction of the courts of the United States” unless the plaintiff can show that his action falls within a specified statutory exception. 28 U.S.C. § 1604; see also Terenkian v. Republic of Iraq, 694 F.3d 1122, 1127 (9th Cir.2012).
Exceptions to sovereign immunity must be interpreted narrowly. Courts should guard against overly broad readings because expanding federal jurisdiction in this area can have serious foreign policy consequences. See Sampson v. Federal Republic of Germany, 250 F.3d 1145, 1155-56 (7th Cir.2001) (“In interpreting the FSIA, *604 we are mindful that judicial resolution of cases bearing significantly on sensitive foreign policy matters, like the case before us, might have serious foreign policy implications which courts are ill-equipped to anticipate or handle”) (internal quotation marks omitted); see also J.H. Trotter, Narrow Construction of the FSIA Commercial Activity Exception: Saudi Arabia v. Nelson, 33 Va. J. Int’l L. 717, 733-34 (1993) (“As [the FSIA] exceptions undergo judicial expansion ... the strains on foreign policy intensify.”)- Indeed, we have expressly recognized the restricted nature of these exceptions. Peterson v. Islamic Republic of Iran, 627 F.3d 1117, 1125 (9th Cir.2010) (describing the FSIA’s exceptions as “narrow”); see also McKesson Corp. v. Islamic Republic of Iran, 672 F.3d 1066, 1075 (D.C.Cir.2012) (describing the FSIA’s exceptions as “narrowly drawn”).
By expanding the commercial-activity exception to encompass the facts in this case, the court, regrettably, claims jurisdiction that is denied to us by statute.
II
Carol P. Sachs, who lives in California, purchased a Eurail pass online from Rail Pass Experts (RPE), an entity located in Massachusetts. A Eurail pass enabled her to ride railways in Austria and the Czech Republic. RPE gained authority to sell Eurail passes from the Eurail Group. OBB Personenverkehr AG (OBB), a railway wholly owned by the Austrian government, is one of many Eurail Group members. OBB and Eurail are separate entities with distinct managements, employees, and purposes. While in Austria, Sachs attempted to board a moving train operated by OBB. She fell between the platform and the train such that she landed on the tracks, suffering severe bodily injuries. Sachs has sued OBB for negligence, strict liability, and breach of implied warranties.
Our analytical task in this case is made easier by the limited nature of the parties’ arguments. Sachs does not contest that OBB is an instrumentality of the Republic of Austria and therefore entitled to foreign sovereign immunity under the FSIA. The majority correctly notes that “[t]he [only] exception relevant to this appeal is the first clause of the commercial-activity provision.” [1] Op. at 590. The commercial-activity exception can helpfully be divided into three requirements: (1) the activity must be commercial rather than sovereign, (2) the activity must be “carried on in the United States by the foreign state,” and (3) the plaintiffs suit must be “based upon” that activity. 28 U.S.C. § 1605(a)(2).
The parties do not dispute that the only relevant commercial activity in the United States was Sachs’ purchase of a Eurail pass from RPE. See Op. at 591 n. 4. OBB does not contest that the sale of the Eurail pass was commercial, rather than sovereign, activity. The first requirement is therefore satisfied. It is the two other requirements that are disputed.
Ill
To repeat, the commercial-activity exception applies only if the activity in question was “carried on in the United States by the foreign state.” 28 U.S.C.
*605 § 1605(a)(2).[2] Although the sale of the ticket by RPE clearly occurred in the United States, OBB disputes that it “carried on” that activity. Rather, OBB argues that the sale is attributable exclusively to RPE. See Phaneuf v. Republic of Indonesia, 106 F.3d 302, 306 (9th Cir.1997) (“Defendants should be permitted to argue ... that they did not act: that there was no commercial activity of, the foreign state.”) (internal quotation marks omitted).
To determine whether the activity is attributable to OBB, it is necessary to consider the meaning of “foreign state.” Because foreign states are not natural persons, they necessarily act through agents. See Op. at 595. The question is what principle limits the extent to which another entity’s activity can be attributed to a foreign state for purposes of the FSIA.
Relying on Phaneuf, the majority rules that the activity of any authorized agent can be imputed to a foreign sovereign. See Op. at 593-94 (“Because we conclude RPE acted as an authorized agent of OBB, we impute RPE’s sale of the Eurail pass in the United States to OBB.”) (citing Pha-neuf, 106 F.3d at 307-08).[3] Thus, it effectively reads “activity carried on ... by a foreign state” and “activity carried on by such state” to mean activity carried on by the authorized agents of a foreign state. This necessarily equates a foreign state and its authorized agents.
With respect, I suggest that such a reading is inconsistent with other provisions of the FSIA. Rather, “foreign state” must be interpreted more narrowly. The approach we adopted in Doe v. Holy See, 557 F.3d 1066 (9th Cir.2009), correctly interpreted “foreign state” and provides a framework with which to analyze this case. Under this narrower reading, “activity carried on ... by a foreign state” cannot include activity carried on by RPE.
A
The term “foreign state,” of course, is used repeatedly in the FSIA, not just in the commercial-activity exception. The meaning of “foreign state” remains constant throughout the statute, and textual evidence from other provisions demonstrates that “foreign state” cannot be so broad as to include all authorized agents of a foreign state.
1
Courts generally presume, that a term is used consistently throughout a statute. See Powerex Corp. v. Reliant Energy Services, Inc., 551 U.S. 224, 232, 127 S.Ct. 2411, 168 L.Ed.2d 112 (2007) (“A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.”); Antonin Scalia & Bryan A. Garner, Reading Law 170 (2012) (discussing the presumption of consistent usage).[4] Here, far from indicating that *606 different uses of “foreign state” have different meanings, the FSIA suggests that the definition remains constant throughout the statute (with the express exception of § 1608, which is not relevant here). See 28 U.S.C. § 1603(a) (“For purposes of this chapter — (a) A ‘foreign, state,* except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).”) (emphasis added).
Confirming this analysis, the Supreme Court has interpreted the term “foreign state”, consistently. In Samantar v. Yousuf 560 U.S. 305, 130 S.Ct. 2278, 176 L.Ed.2d 1047 (2010), the Court interpreted “foreign state” as it was used in § 1604, which grants immunity to “foreign state[s].” 28 U.S.C. § 1604. In doing so, the Court expressly relied on the meaning of “foreign state” in an exception to immunity found in § 1605(a)(5). See Samantar, 560 U.S. at 317-18, 130 S.Ct. 2278. Such approach is sensible only if “foreign state” has the same meaning in both provisions. Clearly, Supreme Court precedent indicates that “foreign state” has the same meaning when providing an exception to immunity as it does when granting immunity.
The majority, by contrast, treats the meaning of “foreign state” for the purposes of § 1604 and the meaning of “foreign state” for the purposes of § 1605 as separate inquiries. See Op. at 595 (contrasting the status required to claim sovereign immunity and the status required for activity to be attributable under the commercial-activity exception).- In light of the presumption of consistent usage and Supreme Court precedent applying it to the FSIA, I cannot accept the majority’s assumption that the interpretation of this term differs so greatly between provisions.
2
Given that the meaning of “foreign state” is consistent, we can turn to analyzing the meaning of that term in other provisions of the FSIA. Textual evidence from § 1605A, which also uses “foreign state,” indicates that the term does not embrace all authorized agents.
Section 1605A(c) creates a cause of action against “[a] foreign state that is or was a state sponsor of terrorism ... and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency.” 28 U.S.C. § 1605A(c) (emphasis added). In Samantar, the Supreme Court tells us that “the creation of a cause of action against both the ‘foreign state’ and ‘any official, employee, or agent’ thereof reinforces the idea that ‘foreign state’ does not by definition include foreign officials.” Samantar, 560 U.S. at 318 n. 11, 130 S.Ct. 2278 (citation omitted). Relying on § 1605A(c) and a similar provision in § 1605(a)(5), the Court invoked the rule against superfluity: “If the term ‘foreign state’ by definition includes an individual acting within the scope of his office, the phrase ‘or of any official or employee ... ’ in 28 U.S.C. § 1605(a)(5) would be unnecessary.” Id. at 318, 130 S.Ct. 2278 (citing Dole Food Co. v. Patrickson, 538 U.S. 468, 476-77, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003) (“[W]e should not construe the statute in a manner that is strained and, at the *607 same time, would render a statutory term superfluous.”)).
Just as the inclusion of “official” in § 1605(a)(5) and § 1605A(c) would be superfluous were “foreign state” to include officials, the inclusion of “agent” in § 1605A(a)[5] and § 1605A(c) would be superfluous if “foreign state” included all agents acting in the scope of their agencies (that is, authorized agents). And just as the avoidance of superfluity in another provision informed Somantar’s interpretation of “foreign state” in § 1604, it similarly affects the meaning of “foreign state” in § 1605(a)(2). Therefore, by the same logic that the Supreme Court used in Soman-tar, the commercial-activity exception’s use of “foreign state” does not include all authorized agents.
B
Because the majority’s approach is inconsistent with the text of the statute, another approach is required. Our opinion in Holy See provides the proper standard for attributing the actions of third parties to foreign states. In determining whether acts taken by the Archdiocese of Portland, the Catholic Bishop of Chicago, -and the Order of the Friar Servants could be imputed to the Holy See for determining jurisdiction under the FSIA, the Holy See court relied on First National City Bank v. Banco Para El Comercio Exterior de Cuba (‘Bancec”), 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983). Bancec created a presumption of separate status for liability purposes. Id. at 626-27, 103 S.Ct. 2591. This presumption could be overcome “in two instances: when ‘a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created,’[6] or when recognizing the separate status of a corporation ‘would work fraud or injustice.’ ” Holy See, 557 F.3d at 1077-78 (quoting Bancec, 462 U.S. at 629, 103 S.Ct. 2591).
While Bancec dealt with questions of substantive liability rather than jurisdiction, Holy See decided that the standard announced in Bancec applied to jurisdictional questions as well. See Holy See, 557 F.3d at 1079. Thus, a determination of whether to attribute the actions of another entity to a foreign state for jurisdictional purposes begins with a presumption against such attribution. That presumption can be rebutted if the other entity is the alter ego of the foreign state or if failure to attribute the entity’s actions to the foreign state “would work fraud or injustice.” Id. at 1077-78. Other circuits have applied Bancec to jurisdictional issues as well. See Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d 843, 848 (D.C.Cir.2000); Arriba Ltd. v. Petroleos Mexicanos, 962 F.2d 528, 533 (5th Cir.1992).
The standard from Holy See fits the statutory text well. Holy See counsels in *608 favor of reading “activity ... by a foreign state” to mean activity by a foreign state, its alter ego, or an entity the recognition of whose separateness would work fraud or injustice.[7] Incorporation of the Bancec standard-has the considerable benefits of not rendering any statutory terms superfluous and being capable of consistent application throughout the FSIA. An interpretation of “foreign state” that includes a foreign state’s alter ego would not make any words in § 1605A superfluous. See supra Part III.A.2.
The majority purports to distinguish Holy See on the ground that Bancec and Holy See, unlike this case, .arose in the context “of corporate affiliates.” Op. at 594 (distinguishing “a corporate relationship” from “principles of agency”). Even assuming the validity of this distinction, the majority draws the wrong conclusion. That Holy See applies a stringent alter ego test to the activity of corporate affiliates does not suggest that we should apply a more lenient authorized agent standard to the activity of non-affiliate entities. If anything, the lack of an affiliate relationship supports application of a more stringent test because a corporate affiliate is more likely to have a close' and substantial relationship with its foreign state than another entity is. That is borne out in this case: OBB may not have even been aware that RPE existed before this lawsuit. Thus, the majority’s “authorized agent” standard creates an anomaly in our case law because it retains the Holy See standard for affiliates but creates a much looser test for non-affiliate entities that will often have fewer ties to the foreign state.
But the majority’s distinction between the corporate affiliate context and. the agency context is problematic for another reason as well: courts applying the Bancec standard have spoken expressly in terms of agency. In Bancec itself, the Court described the alter ego analysis as relevant because such extensive control creates “a relationship of principal and agent.” Bancec, 462 U.S. at 629, 103 S.Ct. 2591; see also Holy See, 557 F.3d at 1079 (“[I]n applying the jurisdictional provisions of the FSIA, courts will routinely have to decide whether a particular individual or corporation is an agent of a foreign state.”). Thus, at least in certain circumstances, we have held that the Bancec standard is the method for determining whether another entity is an agent of a foreign state. The majority, therefore, cannot distinguish Holy See on the ground that it applies to the actions of corporate affiliates rather than agents.
Of particular importance here is that the meaning of “agent” or “agency” varies in different legal contexts. See Holy See, 557 F.3d at 1080 (“ ‘Agent’ can have more than one legal meaning.”). In Holy See, the court contrasted the typical common law agency analysis with the first prong of the Bancec standard, See id. (“The Bancec standard is in fact most similar to the ‘alter,ego’ or ‘piercing the corporate veil’ standards ...”).
The plaintiff in Holy See alleged a traditional agency relationship as the basis for attributing the actions of others to the Holy See. See id. (“Doe does directly allege in his complaint’ that the corporations are ‘agents’ of the Holy See.”); Pl.-Appellee/Cross-Appellant John V. Doe’s Principal and Resp. Br., 2007 WL 923313, II.C.l (“Appellants Catholic Bishop, Archdiocese and Order, were the agents of Appellant Holy See, acting in furtherance of the purposes of the the [sic] Holy See, doing the kind of acts they were engaged *609 to perform, and were motivated, at least in part, to further the purposes of the Holy See.”)- Nonetheless, the Holy See court ruled that it could not “infer from the use of the word ‘agent’ that Doe [wa]s alleging the type of day-to-day control that Bancec ... require[s] to overcome the presumption of separate juridical status.” Holy See, 557 F.3d at 1080. If a common law agency relationship were all that is required for the imputation of an agent’s actions to the foreign state, surely the court would have treated Doe’s allegation differently in Holy See. Thus, it is clear that the sort of agency relationship that Bancec and Holy See required for the imputation of actions to the foreign state (an alter ego relationship, for example) differs significantly from the all-authorized-agents standard adopted by the majority.
C
Sachs simply cannot show that RPE’s actions are attributable to OBB under the Bancec standard. The first method of rebutting the presumption of separateness, the alter ego analysis; certainly cannot apply on these facts. Far from being the alter ego of OBB, RPE and Eurail are independent companies with different managements from OBB. RPE may be a subagent of Eurail, but Eurail is controlled by a group of railways, not OBB alone. The second method of rebutting the presumption of separateness — whether recognizing separate existences would work fraud or injustice — certainly does not suggest that the actions of RPE should be attributed to OBB. In Bancec, the Court found such equitable prong applicable because Bancec was attempting to recover money that would directly benefit the Cuban government while simultaneously arguing that its claim should not be subject to a set-off that would have applied if the Cuban government sued directly. Bancec, 462 U.S. at 631-32, 103 S.Ct. 2591. Here, OBB has not behaved in a comparable way. OBB has not, for example, inconsistently characterized RPE’s actions to its advantage; it has consistently asserted that RPE’s actions cannot be attributed to it.
If there is any “injustice” at all from failing to impute RPE’s actions to OBB, it stems from Sachs’ inability to sue OBB in American courts. This, however, is not the Sort of injustice that validates treating RPE as if it were OBB. The inability to sue in American courts is a natural result of recognizing foreign sovereign immunity, the general rule and policy of the FSIA. See Sachs v. Republic of Austria, 695 F.3d 1021, 1026 (9th Cir.2012) (“Any injustice that results is no greater than the mine-run of cases — jurisdiction over a foreign state is, after all, ordinarily not available.”).
D
The majority relies on Barkanic v. General Administration of Civil Aviation of the People’s Republic of China, 822 F.2d 11 (2d Cir.1987), and Kirkham v. Societe Air France, 429 F.3d 288 (D.C.Cir.2005). These cases do not analyze when the acts of agents can be attributed to a foreign state. As acknowledged by the majority, see Op. at 592 n. 5a, the parties in Barkanic and Kirkham did not dispute that the relevant actions constituted activity of the foreign state. See Barkanic, 822 F.2d at 13 (assuming without discussion that a ticket sale by Pan American was attributable to the defendant); Kirkham, 429 F.3d at 291-92 (noting that the “sole question” before the court related to the “based upon” prong of the commercial-activity exception). Although those courts “had an independent duty to assess jurisdiction,” see Op. at 592 n. 5b, their decisions “do[ ] *610 not stand for the proposition that no defect existed.” Arizona Christian School Tuition Organization v. Winn, — U.S.-, 131 S.Ct. 1436, 1448, 179 L.Ed.2d 523 (2011) (“When a potential jurisdictional defect is neither noted nor discussed, in a federal decision, the decision does not stand for the proposition that no defect existed.”).
The majority makes much of the possibility that, if its reading were rejected, federal courts would not be able to exercise jurisdiction over foreign states based on the actions of travel agents, • Op. at 595-97. The majority’s concern seems to stem from the idea that the lack of federal jurisdiction would leave plaintiffs to sue abroad, a result the majority describes as too “chaotic” for Congress to have intended. Op. at 597. But, the general rule for the FSIA is that foreign states are immune from suit; there will be many instances in which Americans who wish to sue foreign sovereigns can only do so overseas. This is a result Congress clearly intended in many instances, so it is hard to see why the same result in this situation should strike the majority as so “chaotic.”
Because Sachs has not shown that RPE and OBB have a relationship that rebuts the Bancec presumption of separate status, I would affirm the district court’s dismissal for lack of jurisdiction.
IV
Even if the sale of the Eurail pass by RPE were “commercial activity carried on ... by the foreign state,” sovereign immunity would still, at a minimum, bar Sachs’ strict liability claims because they are not “based upon” the sale of the pass, as would be required for the commercial-activity exception to apply. 28 U.S.C. § 1605(a)(2). Assuming the majority’s interpretation of this requirement is correct, I agree that Sachs’ negligence and implied warranty claims would be “based upon” the sale of the Eurail pass had the sale been attributable to OBB. The Supreme Court has clarified that the commercial activity in question, here the sale of the Eurail pass, must be an “element[ ] of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case.” Saudi Arabia v. Nelson, 507 U.S. 349, 357, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). The majority understands this to mean that a claim is based upon commercial activity if that activity will establish one element of the claim. But still, a mere connection between the claim and the commercial activity is insufficient. Sun v. Taiwan, 201 F.3d 1105, 1110 (9th Cir.2000) (citing Nelson, 507 U.S. at 362, 113 S.Ct. 1471).
The majority believes that Sachs’ negligence claim is “based upon” the sale of the Eurail pass because the sale evidences that OBB, as a common carrier, owed a duty of care to Sachs, a passenger. Op. at 599-601. This strikes me as a proper application of the majority’s rule; however, the majority also concludes that Sachs’ other claims are “based upon” the sale of the Eurail pass because the sale was the transaction necessary for an implied warranty claim or strict liability claim. Op. at 601-02.
This theory inappropriately lumps together Sachs’ strict liability claims and implied warranty claims. While the majority is correct that both types of claims center on “attributing liability based on the sale of a product into the market,” Op. at 602, there is a crucial difference between them. Strict liability claims do not require proof that the plaintiff entered a transaction with the defendant. Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963), which the majority relies on to explain California law on strict liability, discusses “the abandonment of the re- *611 qúirement of a contract between” the manufacturer and the plaintiff. Id., 27 Cal.Rptr. 697, 377 P.2d at 901; see also Restatement (Third) of Torts: Products Liability § 1 cmt a (1998) (“Strict liability in tort for defectively manufactured products merges the concept of implied warranty, in which negligence is not required, with the tort concept of negligence, in which contractual privity is not required.”).
While the majority claims that Sachs’ strict liability claim requires her to prove that OBB was a “seller,” Op. at 602, California cases suggest that a strict Lability plaintiff need not prove that the defendant is a seller. See Price v. Shell Oil Co., 2 Cal.3d 245, 85 Cal.Rptr. 178, 466 P.2d 722, 726 (1970) (“[W]e can perceive no substantial difference between sellers of personal property and non-sellers, such as bailors and lessors. In each instance, the seller or non-seller places [an article] on the market, knowing that it is to be used without inspection for defects.”) (second alteration in original) (internal quotation marks omitted); Greenman, 27 Cal.Rptr. 697, 377 P.2d at 901 (“To establish the manufacturer’s liability it was sufficient that plaintiff proved that he was injured while using the Shopsmith in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff was not aware that made the Shopsmith unsafe for its intended use.”) Under California law, it appears that OBB’s provision of train service and Sachs’ use of it are sufficient to subject OBB to strict liability. Therefore, Sachs has not established that she must prove that OBB was. a “seller” in order to prevail on her strict liability claim.
Because contractual privity is not an element of Sachs’ strict liability claims, they are not “based upon” the sale by RPE, the only relevant commercial activity. Sachs, therefore, may not invoke the commercial-activity exception to overcome OBB’s sovereign immunity. Even if RPE’s sale, of the Eurail pass to Sachs were attributable to OBB, the majority should affirm the district court insofar as it dismissed the strict liability claims for lack of jurisdiction.
V
For the foregoing reasons, I would affirm the district court’s dismissal for lack of jurisdiction. Because RPE’s sale of the Eurail pass is not attributable to OBB, Sachs has not alleged commercial activity “by the foreign state.” Indeed, even if the majority’s theory of attribution were valid, the strict liability claims would still need to be dismissed because they are not “based upon” the sale to Sachs in the United States.

. "A foreign state shall not be immune from the jurisdiction of courts of the United States ... in any case ... in which the action is based upon a commercial activity carried on in the United States by the foreign state.” 28 U.S.C. § 1605(a)(2). Like the majority, I use the phrase “commercial-activity exception” to refer to the first clause of § 1605(a)(2). See Op. at 590 n. 3.

. Congress defined “commercial activity carried on in the United States by a foreign state” to mean "commercial activity carried on by such state and having substantial contact with the United States.” 28 U.S.C. § 1603(e).

. While Phaneuf held that an agent must have acted with actual ■ authority in order for its actions to be attributed to a foreign state, Phaneuf, 106 F.3d at 308, it did not hold that actual authority was sufficient to allow .for such attribution in all circumstances. The actions at issue in Phaneuf were taken by members of Indonesia’s National Defense Security Council, rather than a corporate entity with whom Indonesia had only a loose relationship, so the, closeness of the connection between the foreign state and the alleged agent was not at issue. See id. at 304, 307.

.The majority misinterprets this analysis as applying the presumption of consistent usage to distinct phrases, "agency or instrumentality of a foreign state” in § 1603(b), "agent of that foreign state [ ] acting within the scope of *606 frís or her ... agency” in § 1605A(c), and the commercial-activity exception in § 1605(a)(2). Op. at 598 n. 13. In reality, I apply the presumption of consistent usage to the term "foreign state,” not to each phrase as a whole. Such application is consistent with Samantar v. Yousuf, 560 U.S. 305, 317-18 & n. 11, 130 S.Ct. 2278, 176 L.Ed.2d 1047 (2010) (interpreting "foreign state” in § 1604 in light of the use of “foreign state” in § 1605A and § 1605(a)(5)).

. Section 1605A(a) uses similar language to create a specific exception to immunity for:
any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by [specified acts] if such act ... is engaged in by an official, employee, or agent of such, foreign state while acting within the scope of his or her office, employment, or agency.
28 U.S.C. § 1605A(a)(l) (emphasis added).

. As will be discussed below, the Court used the term "agent” in a different sense than the majority does. Courts have interpreted this prong of the Bancec standard to refer to an "alter ego” analysis. See, e.g., Holy See, 557 F.3d at 1080 (comparing the Bancec standard to an " 'alter ego’ or 'piercing the corporate veil’ ” standard); Transamerica Leasing, Inc. v. La República de Venezuela, 200 F.3d 843, 848 (D.C.Cir.2000) (noting that "in the case cited by the Supreme Court to illustrate the agency exception, various corporations were allegedly operated as a 'single enterprise.’ ”).

. How (or whether) this standard would apply to the actions of an individual agent, rather than entity agent, need not be addressed in this case. RPE is an entity, not an individual.