[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14058

_____

ARCHITECTURAL INGENIERIA SIGLO XXI, LLC,

Plaintiff-Appellant,

*versus*

DOMINICAN REPUBLIC,
INSTITUTO NACIONAL
DE RECURSOS HIDRAULICOS,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:13-CV-20544-KMM

_____

Before BRANCH and LUCK, Circuit Judges, and SANDS,* District Judge.

SANDS, District Judge:

This appeal arises from a bench trial on Plaintiff-Appellant, Architectural Ingenieria Siglo XXI, LLC's ("AIS"), Amended Complaint for breach of contract and damages following vacatur of a prior judgment and remand by a prior panel of this Court. *Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*, 788 F.3d 1329, 1340 (11th Cir. 2015) ("*Architectural I*"). The contract to construct an irrigation project in the Dominican Province of Azua was entered into between AIS ("Appellant"), Sun Land & RGITC LLC,[1] ("Sun Land"), the Instituto Nacional de Recursos Hidraulicos ("INDRHI"), an independent autonomous entity within the Dominican Republic, and the Dominican Republic. After the effective date of the agreement consisting of the Purchase Agreement and the Protocol, which together formed the contract at the center of this dispute, performance of the contract continued through two agreed extensions. Although a third extension had been approved by the Parties, it never went into effect because the contract had already been terminated by INDRHI.

---

* Honorable W. Louis Sands, United States District Judge for the Middle District of Georgia, sitting by designation.

[1] Co-Plaintiff, Sun Land & RGITC LLC, f/k/a Sun Land & RGITC, Co., did not join in the appeal.

Pursuant to the Amended Complaint, AIS and Sun Land alleged that Dominican Republic and INDRHI breached the contract and sought damages for the breach along with other specified damages. Following a bench trial, the district court issued its findings of fact and conclusions of law. Therein, the district court confirmed its earlier summary judgment that INDRHI had breached the agreement by terminating the contract in violation of the contract's *force majeure* terms and granted damages against INDRHI in the amount of $576,842.00, plus prejudgment interest. The district court also found that the Dominican Republic had not separately breached the contract and AIS and Sun Land had failed to overcome the Foreign Sovereign Immunities Act's ("FSIA") presumption that the Dominican Republic and INDRHI are separate entities. 28 U.S.C. § 1603(b). The Court also found that damages for unpaid work invoices were not due from INDRHI or the Dominican Republic, but rather co-Plaintiff, Sun Land. The Court reconsidered its findings and conclusions of law upon Appellant's Motion and denied it.

This appeal by AIS followed. AIS contends the trial court abused its discretion and clearly erred by finding that the presumption of separateness was not overcome, that the Dominican Republic did not breach the contract and that damages from unpaid invoices for work performed was not due from INDRHI or the Dominican Republic, but rather Sun Land. AIS also contends that the trial court's determination of damages was clearly erroneous and an abuse of discretion. Upon review, because we find that the trial court's findings are substantially supported by the entire record and

4                    Opinion of the Court                    20-14058

the court correctly applied the applicable law, it did not clearly err. Therefore, with the benefit of oral argument, we affirm.

**RELEVANT FACTUAL HISTORY**[2]

## I.    The Contract

This appeal focuses upon a contract to construct an irrigation infrastructure project, in the Dominican Province of Azua, commonly referred to as the Azua II project. At some point in the year 2000, INDRHI, a governmental agency, which is substantially, although not wholly funded by designations in the Dominican Republic's national budget, proposed the construction of the Azua II project. The purpose of the Azua II project was to irrigate a 3,000-hectare area. INDRHI and the Secretario Tecnico de la Presidencia de la Republica ("Technical Secretary"), acting on behalf of the Dominican Republic, invited contractors to submit bids to construct the Azua II project. Sun Land and AIS ultimately submitted the winning bid. Thereafter, on November 20, 2001, then-President of the Dominican Republic, Hipolito Mejia, issued an executive order granting authority to the Technical Secretary and INDRHI to enter into various agreements on behalf of the Dominican Republic in furtherance of the Azua II project.

One of those agreements was a Purchase Agreement between Sun Land, INDRHI and the Technical Secretary of the

---

[2] Because the district court did not always elaborate upon some of its conclusions, we, reviewing the entire record, include greater detail in our analysis for clarity.

20-14058                Opinion of the Court                5

Dominican Republic. Pursuant to the terms of the Purchase Agreement, Sun Land agreed to purchase and export to the Dominican Republic the products and services necessary to complete the Azua II project, including a feasibility study to determine the exact needs of INDRHI. The Purchase Agreement provided that Azua II was to be a turnkey project, which would take twenty-four (24) months to complete, for a total fixed cost of $51,777,321.00.

Pursuant to the Purchase Agreement, on March 7, 2002, INDRHI and AIS executed Contract No. 10375 to provide for the studies, designs, and construction of the Azua II project. On February 13, 2004, Sun Land, AIS and INDRHI entered into "The Protocol" that was designed to execute the terms of the Purchase Agreement. The Protocol expressly superseded Contract No. 10375. Accordingly, when this matter was previously appealed in *Architectural I*, a prior panel of this Court held that the Purchase Agreement and the Protocol together are the contract at the center of this dispute. 788 F.3d at 1340.

With the Purchase Agreement and the Protocol in place, AIS commenced work on the Azua II project on March 16, 2004. Apart from a three-month stop work order delay, from August 2004 to November 2004, that was issued by INDRHI, the project continued without interruption. Over the next four years, AIS leveled the land and constructed lagoons and dykes. The majority of the actual construction work took place in 2007 and 2008. By all accounts, AIS's performance of its construction duties over that four-year period was satisfactory, with AIS fully complying with its obligations

as principal contractor.  Despite AIS fully complying with its obligations as principal contractor, the Azua II project did not proceed on time, and it became impossible to provide a turnkey project for the initial budget of $51,777,321.00 in twenty-four (24) months, as provided in the initial contract.

AIS ceased construction in August 2008 due to nonpayment. Thereafter, on February 13, 2009, INDRHI notified Sun Land via letter that because financing for the Azua II project had fallen through, INDRHI would be terminating the Protocol citing *force majeure*.

## II.     Financing Azua II

The Purchase Agreement provided that the total contract price ($51,777,321.00) would be financed, 85% of which was to come from a Credit Agreement with SunTrust Bank, N.A. ("SunTrust"), guaranteed by Export-Import Bank of the United States ("EX-IM"), with the remaining 15% of the total contract price to be financed through a lender engaged by Sun Land.  In sum, the Dominican Republic was the borrower, SunTrust was the lender through the letter of credit, and EX-IM was the guarantor.  To fulfill its obligations under the Purchase Agreement, Sun Land engaged the Florida Export Finance Corporation ("FEFC") to arrange the 85% guaranteed loan with EX-IM.

Under the terms of the Purchase Agreement, the funds could only be disbursed to Sun Land, and could only be disbursed after EX-IM fully guaranteed the loan.  In order for EX-IM to fully guarantee the loan, the following three (3) steps were required: (1)

the Dominican Republic complete the conditions precedent in the Credit Agreement; (2) EX-IM issue an "Operative Memorandum" agreeing that the conditions precedent had been satisfied; and (3) EX-IM issue a Letter of Credit identifying how Sun Land could disburse the funds.

This three-step approval process would prove the Azua II project's undoing not due to any fault of the Parties to this action, but rather due to bureaucratic inefficiencies. Those bureaucratic inefficiencies stemmed from the inattentiveness of EX-IM's attorneys. For example, evidence was introduced at trial that all Parties agreed that the conditions precedent for EX-IM's guarantee were satisfied as of October 28, 2003. However, in April 2004, EX-IM's attorney informed the Parties that the conditions precedent had not been satisfied, because documents were missing from the Dominican Republic's submission. It was later discovered, however, that the missing documents had simply been misplaced by EX-IM's attorney. EX-IM attorney's inattentiveness significantly delayed the project, because EX-IM's attorney took months to respond to email, objected to statements of Dominican Republic law, and lost key documents, including a $43,000,000.00 promissory note.

As a result of these bureaucratic delays, by the time EX-IM issued a Letter of Credit in April 2006, the Credit Agreement's initial Final Disbursement Date of October 15, 2005, had already elapsed. Accordingly, the Credit Agreement was amended for the first time on August 14, 2006, to extend the Final Disbursement Date to October 15, 2007. The Parties agreed to amend the Credit

Agreement a second time on March 2, 2007, to address issues involving certain local costs that had not been accounted for by EX-IM. The Parties agreed to amend the Credit Agreement for a third time in January 2008 to extend the Final Disbursement Date to October 15, 2009.

The Third Amendment to the Credit Agreement would not be finalized until September 4, 2008, or presented to then-President Leonel Fernandez of the Dominican Republic, for formal submission to the Dominican Republic Congress, until September 30, 2008. It is unclear whether President Fernandez ever submitted the Third Amendment to the Credit Agreement to the Dominican Republic Congress for ratification. In any event, congressional ratification became a moot issue when SunTrust withdrew from the Azua II project before the Dominican Congress ratified the amendment, citing the adversities faced in obtaining an extension of the term period of the contract. INDRHI then notified Sun Land on February 13, 2009, that it was terminating the Protocol citing *force majeure*.

### III.    Payments Made Under the Contract

Under the terms of the Protocol, INDRHI and the Dominican Republic were required to review AIS's invoices and if approved, transmit them with the appropriate approval documents to Sun Land. Sun Land was then required to submit those approval documents to the lender, SunTrust. SunTrust was then required to disburse funds to Sun Land pursuant to the terms of the Credit Agreement.

During the five-month period, from May 2007 to October 15, 2007, during which funds for the Azua II project were available, SunTrust made twenty-seven (27) disbursements under the Credit Agreement to Sun Land. Those twenty-seven (27) disbursements totaled over $15,000,000.00. In anticipation of the Final Disbursement Date, INDRHI, AIS, and Sun Land also took an advance payment of $3,500,000.00 to continue work through December 2007. Eighty-five percent of that advance payment, $2,980.421.00, was held by Sun Land in an account.

AIS in comparison issued a total of twenty-two (22) Cubicaciones (hereinafter "work invoice") to be paid to AIS by Sun Land, in the total amount of $12,398,044.00. The sum of SunTrust's disbursements exceeded the amount that AIS billed in its work invoices. After the Final Disbursement Date, INDRHI instructed Sun Land in writing to pay AIS the balance owed that had been withheld by Sun Land. Despite this, AIS was not paid in full by Sun Land for work invoices 18(c)–22. The remission of the payment after approval was Sun Land's responsibility.

## IV.    Subsequent Pertinent Events

After the contract was terminated, the following pertinent events occurred. In March 2009, a month after INDRHI terminated the contract, then-President of the Dominican Republic, Leonel Fernandez, allegedly advised the president of AIS, Mr. Morales Perez, that he did not like Sun Land and would not continue the work. In April 2009, Utah State University, which had been hired to serve as the Construction Project Supervisor, issued a

memorandum indicating that the President of the Dominican Republic had been offended by representatives from Sun Land and had decided to freeze the project in December 2008, which was four months after AIS ceased work on the project due to nonpayment. Finally, in November 2011, years after the termination of the contract by INDRHI, INDRHI issued several press releases stating that it had entered into a contract with Constructora Queiroz Galvao, S.A. ("CQG"), a Brazilian company, to complete Azua II.

## RELEVANT PROCEDURAL HISTORY

Following the vacatur and remand of the entry of default judgment, against Appellees, Appellant AIS and Sun Land filed an Amended Complaint, alleging one count of breach of contract by INDRHI and the Dominican Republic. Therein, Appellant alleged that the Defendants had terminated the contract in violation of its terms and failed to pay AIS, Appellant, the agreed price for the work completed. The Amended Complaint is the operative complaint in this matter.

At the summary judgment stage of proceedings, the district court granted partial summary judgment in favor of Appellant and Sun Land, co-plaintiff below, concluding that INDRHI was liable for breach of contract, because it had failed to adhere to the notice provisions relating to *force majeure*. The district court denied Appellant and Sun Land's motion for summary judgment as to the Dominican Republic's liability. However, because it concluded that AIS and Sun Land had not overcome the presumption that INDRHI and the Dominican Republic were entitled to separate juridical

20-14058              Opinion of the Court                    11

status but had presented a genuine issue of material fact on that question, the district court also denied the Appellees' motion for summary judgment.

Thereafter, a bench trial was held between January 30, 2017, and March 14, 2017.[3] Following the bench trial, the district court issued its findings of fact and conclusions of law on September 30, 2017. Therein, the district court found that INDRHI was liable to Appellant-Plaintiff, AIS, and Sun Land, for breach of contract because its termination of the contract due to *force majeure* had been in violation of the notice provisions of the contract. The court found that the Dominican Republic was not liable for INDRHI's breach of contract, because it also found that Appellant had failed to overcome the presumption that the Dominican Republic and INDRHI were separate entities, and further that the Dominican Republic had not separately breached the contract. The district court then awarded Appellant AIS damages for the breach of contract in the amount of $576,842.00 as lost profits, plus prejudgment interest against INDRHI.

Appellant and Sun Land subsequently moved to amend the district court's findings of fact pursuant to Fed. R. Civ. P. 52(b) or in the alternative for a new trial under Fed. R. Civ. P. 59(a)(2). Therein, they contended that amendment or a new trial was appropriate,

---

[3] The bench trial lasted for a total of eight (8) days, which were interspersed between the months of January and March 2017.

because the district court had (1) failed to attribute liability to the Dominican Republic for delays in securing the project's financing that Appellant believes were attributable to the Dominican Republic Congress's actions, (2) improperly treated  certain evidence as inadmissible hearsay and failed to give it proper weight, (3) overlooked evidence that Appellant believes establishes that the Dominican Republic instructed INDRHI to terminate Azua II, and (4) improperly excused Defendants (Appellees) for nonpayment of invoiced work.  The district court treated Appellant's motion to amend as a motion for reconsideration and denied it, except for partially altering its prior characterization of certain evidence as inadmissible hearsay.  This appeal followed.

## STANDARD OF REVIEW

"On appeal of a district court order from a bench trial, we review the court's conclusions of law *de novo* and its findings of fact for clear error." *HGI Assocs., Inc. v. Wetmore Printing Co.*, 427 F.3d 867, 873 (11th Cir. 2005); *see also* Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.")  "Clear error is a highly deferential standard of review." *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1319 (11th Cir. 2007) (quoting *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1350 (11th Cir. 2005)).

"The court's findings will stand as long as they are supported by substantial evidence." *Fischer v. S/Y NERAIDA*, 508 F.3d 586, 592

20-14058                Opinion of the Court                13

(11th Cir. 2007) (citing *Thelma C. Raley, Inc. v. Kleppe*, 867 F.2d 1326, 1328 (11th Cir. 1989)).  This is because "the district court has the advantage of observing the witnesses and evaluating their credibility firsthand, and the standard of review imposes an especially heavy burden on [the] appellant." *Id.* (quotation marks omitted). Stated otherwise, if "the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Morrissette-Brown*, 506 F.3d at 1319 (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985)).  This is because when "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.*

Finally, we "may affirm [the district court's judgment] on any ground that finds support in the record." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001) (quotation marks and citations omitted).

## **DISCUSSION**

Appellant, AIS, contends that the district court erred on six (6) separate issues.[4] AIS's six (6) issues, however, are subsumed by

---

[4] Specifically, (1) whether the district court erred as a matter of law in failing to hold the Dominican Republic legally responsible for the actions of its own Congress; (2) whether the district court abused its discretion or committed clear error in ignoring admitted, consistent, and unrebutted evidence that established the Dominican Republic's direct liability for breach of contract; (3) whether the district court abused its discretion in ruling that the Dominican

three (3) controlling issues on appeal which are: (A) whether the district court's conclusion that the Dominican Republic and INDRHI are separate entities is supported by substantial evidence; (B) whether the district court's finding that the Dominican Republic did not breach the contract is supported by substantial evidence; and (C) whether the district court's determination of Appellant's damages is supported by substantial evidence pursuant to applicable law.  We shall address each issue in turn.

## A. The District Court's Finding that the Dominican Republic and INDRHI Are Separate Entities Is Supported by Substantial Evidence.

Appellant first contends that the district court abused its discretion by concluding that Appellant and Sun Land, *i.e.*, Plaintiffs below, "[had] not met their burden of overcoming the presumption of juridical separateness" under the Foreign Sovereign Immunities Act.  Appellees argue this question was already decided in *Architectural I*, wherein they contend that this Court held that the Dominican Republic and INDRHI "had established entitlement to the FSIA presumption of separateness and that AIS had failed to overcome it."

Republic and INDRHI were entitled to the presumption of separateness; (4) whether the district court abused its discretion in limiting AIS's lost future profits in a manner that allegedly applied the wrong legal standard and ignored the evidence; (5) whether the district court's finding that AIS had been compensated for its delay damages was clear error; and (6) whether the district court erred as a matter of law by not awarding damages for work performed once it found AIS had not been paid for work it performed and invoiced.

In *Architectural I*, the Dominican Republic challenged the district court's subject matter jurisdiction over AIS and Sun Land's breach-of-contract claims. We held that the district court had subject matter jurisdiction over the Dominican Republic pursuant to its explicit waiver of sovereign immunity contained in the Purchase Agreement which the Dominican Republic had signed. 788 F.3d at 1341–42. We further held that the waiver extended to the "[P]rotocol [as it] constitutes a transaction contemplated by the [P]urchase [A]greement." *Id*. at 1342. We then held *with respect to three side agreements* signed only by INDRHI—which we found to be unrelated to the Purchase Agreement or Protocol—that AIS and Sun Land had failed to overcome the FSIA's presumption that the Dominican Republic and INDRHI are separate entities under the FSIA. *Id*. at 1342–43. Thus, we concluded that the Dominican Republic was not amenable to suit in federal court for its alleged breach *of those three agreements*. *Id*. at 1343.

However, our holding in *Architectural I* focused on the district court's jurisdiction and is not the law of the case as to the issue on appeal here; *i.e.*, whether AIS met its burden to overcome the FSIA presumption of juridical separateness as to the Purchase Agreement and Protocol. Nor did we discuss in *Architectural I* the elements necessary to overcome the presumption. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16 (1988) ("As most commonly defined, the doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)); *see*

*also Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 430 F.3d 1326, 1332 (11th Cir. 2005) (noting that the law-of-the-case doctrine only applies to the extent the issue in question was within the scope of the prior appeal).

Therefore, to hold the Dominican Republic liable for INDRHI's breach of contract, AIS had to overcome the FSIA's presumption of separate legal status. As this is a mixed question of law and fact, the standard of review depends on "whether answering [the question] entails primarily legal or factual work." *Monasky v. Taglieri*, 140 S. Ct. 719, 730 (2020) (quoting *U.S. Bank Nat'l. Ass'n v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018)).

> Mixed questions are not all alike. . . . [S]ome require courts to expound on the law, particularly by amplifying or elaborating on a broad legal standard. When that is so—when applying the law involves developing auxiliary legal principles of use in other cases—appellate courts should typically review a decision *de novo*. But . . . other mixed questions immerse courts in case-specific factual issues—compelling them to marshal and weigh evidence, make credibility judgments, and otherwise address what we have (emphatically if a tad redundantly) called "multifarious, fleeting, special, narrow facts that utterly resist generalization." And when that is so, appellate courts should usually review a decision with deference.

*Vill. at Lakeridge*, 138 S. Ct. at 967 (citations omitted). Here, for the reasons noted below, we review *de novo* the district court's finding that the Dominican Republic and INDRHI are separate entities.

According to the Supreme Court of the United States, as stated in *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, the FSIA's presumption of separate legal status may be overcome in two ways: (1) "where a corporate identity is so extensively controlled by its owner that a relationship of principal and agent is created" or (2) where recognition of the instrumentality as an entity separate from the state "would work fraud or injustice." 462 U.S. 611, 629 (1983) (quotations omitted). In this case, AIS attempted to overcome the FSIA's presumption by contending that INDRHI was so extensively controlled by the Dominican Republic that a relationship of principal and agent existed.

Under this Circuit's precedent, in cases "[w]here jurisdiction depends on an allegation that the particular defendant was an agent of the sovereign, the plaintiff bears the burden of proving this relationship." *S & Davis Int'l Inc. v. Republic of Yemen*, 218 F.3d 1292, 1299 (11th Cir. 2000) (quoting *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 533–34 (5th Cir. 1992)). When "applying the agency exception to the rule of sovereign immunity [and separateness], how much control the sovereign exercised over the instrumentality is reviewed." *Id.* at 1299 (quoting *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000)). "Control is relevant when the sovereign exercises its control in such a way as to make the instrumentality its agent; in that case control renders the sovereign amenable to suit under ordinary agency principles." *Id.* (alteration adopted) (quoting *La Republica de Venezuela*, 200 F.3d at 849). While it is true that a "sovereign need not exercise complete dominion over an instrumentality—to the point of stripping

it of any meaningful separate identity—in order to establish a relationship of principal and agent," the sovereign must still exercise "its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors." *Id.*

In this Circuit's seminal case on the FSIA's presumption of separateness under 28 U.S.C. § 1603(b), *Yemen*, we held that the presumption of separateness was overcome, such that the instrumentality was not an independent entity from the sovereign, when the instrumentality "fail[ed] to provide any evidence of an independent entity" and "issu[ed] direct orders to terminate the contract." 218 F.3d at 1299; *see Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695 (1976). Our sister circuits have since refined the extensive control inquiry required by the Supreme Court in *Banco Para* and have held that a sovereign exercises its control in such a way as to make the instrumentality its agent when the sovereign state "exercises significant and repeated control over the instrumentality's day-to-day operations." *EM Ltd. v. Banco Cent. de la Republica Arg.*, 800 F.3d 78, 91 (2d Cir. 2015); *see Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 178 (5th Cir. 1989) (collecting cases holding failure to prove day-to-day control fails to overcome presumption of juridical separateness).

Appellees contend that the district court's decision was correct because the presumption of juridical separateness may be overcome only by evidence that the foreign sovereign "exercises significant and repeated control over the instrumentality's

day-to-day operations." However, we have never specifically held that to overcome the presumption of juridical separateness a party is required to provide evidence that the foreign sovereign "exercises significant and repeated control over the instrumentality's day-to-day operations." As discussed below, because AIS did not meet its burden of proving the existence of a principal-agent relationship under *Yemen*, it is also unnecessary for us to consider at this time whether to adopt our sister circuits' refinements.

AIS did not meet its burden because the additional testimonial evidence AIS presented at trial merely establishes that INDRHI was a governmental organization financed by the state budget and that some of INDRHI's Board and Management were appointed by the Dominican Republic's Executive Branch. That is insufficient under *Yemen*, because the parent must exercise "its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors." 218 F.3d at 1299 (quoting *La Republica de Venezuela*, 200 F.3d at 849).

Furthermore, INDRHI's designated corporate representative, Jose Raul Perez-Duran, testified extensively about INDRHI's autonomy and separate status, which supports the conclusion that INDRHI, despite being a governmental organization, was not under the Dominican Republic's operational control. That evidence focused on how INDRHI has its own bank accounts as well as accounting system, was financed by the state budget and external resources, and how INDRHI's executive director made all the

decisions concerning contracts, projects, personnel, and INDRHI's budget.   Mr. Duran also noted that apart from appointing INDRHI's director, the President of the Dominican Republic had no function within INDRHI.  These facts sufficiently cut against AIS's contention that INDRHI was under the President of the Dominican Republic's day-to-day operational control.

Accordingly, we find that substantial evidence supports the district court's finding that Appellant failed to overcome the FSIA's presumption that the Dominican Republic and INDRHI are separate entities, and thus, we conclude that the district court did not err in making this finding.

## B. The District Court's Finding that the Dominican Republic Did Not Breach the Contract Is Supported by Substantial Evidence.

Despite the district court correctly concluding that INDRHI and the Dominican Republic are separate, Appellant also disagrees with the district court's finding and conclusion that the Dominican Republic did not itself, apart from INDRHI, breach the contract.  It is Appellant's theory that the Dominican Republic breached the contract by either (1) causing the Azua II project's financing delays or (2) because the President of the Dominican Republic ordered the contract to be terminated.  Neither theory of the case withstands scrutiny upon review of the entire record for the reasons stated below.

1.  **The District Court's Finding that the Dominican Republic Did Not Breach the Contract by Causing Azua II's Financing Delays Is Supported by Substantial Evidence.**

In the district court's findings of fact, the district court concluded that Azua II's financing delays were not attributable to any one party but were rather due to "bureaucratic delays and a complex approval system." Appellant contends that this finding was clear error because the financing delays were attributable to the Dominican Republic, and therefore, the Dominican Republic breached the contract.

In support of its contention that the district court committed clear error, Appellant highlights a letter from the Dominican Republic's State Secretary of Finance, dated July 9, 2007. That letter was submitted in support of a request to extend the Final Disbursement Date. In that letter, the State Secretary of Finance acknowledged that the "reasons for the delay were mainly because of the spending restriction measures imposed by the Dominican Government," which stemmed from a banking crisis that began in 2003. Appellant also relies upon the district court's finding that there was "no evidence that [AIS] caused any of the delays." It is essentially AIS's position that since the district court found that AIS was not the cause of the delays, and AIS has some evidence that supports the conclusion that the Dominican Republic was at fault, that the district court committed clear error by ignoring the July 9, 2007 letter, and by finding that the delays are not attributable to any

one party, "but were instead the result of bureaucratic delays and a complex approval system."

While it is true that no evidence was presented that AIS caused the delay in securing financing, Appellant's appeal and theory of the case disregard the timeline of events, the other evidence that was presented at trial, and the standard of review by which we are bound. In the present case, there was substantial evidence to support the district court's finding that the delays are not attributable to any one party to the contract, "but were instead the result of bureaucratic delays and a complex approval system." That evidence focused on how EX-IM's attorneys, who were key players in securing financing for the project, took months to respond to email and draft key documents, lost other documents, issued a letter of credit in the wrong amount, and required the Dominican Republic to amend and submit the Credit Agreement to the Dominican Congress on three separate occasions. That evidence also makes it clear that the Dominican Republic had continued to comply with its obligations under the contract because they continued to satisfy the conditions precedent in the Credit Agreement.

Even if there is some evidence that the delays were attributable to the Dominican Republic as Appellant contends, Appellant's argument focuses solely on the delay related to the third extension of the Final Disbursement Date. This argument is not compelling when examined within the entire timeline of the contract as the district court did. Appellant ignores the fact that the Parties continued to perform under the contract during the prior extensions

of the Final Disbursement Date. For example, even though it became clear in 2005 that financing for the project was an issue, the majority of the actual construction work performed by AIS took place in 2007 and 2008—after the Credit Agreement's initial Final Disbursement Date of October 15, 2005, had elapsed. AIS commenced work on the AZUA II project in March 2004, and other than a three-month stop work order, the project continued without interruption until AIS ceased construction in August 2008. Recall that under the terms of the Purchase Agreement, funds could not be disbursed to Sun Land for further disbursement to AIS until EX-IM fully guaranteed the loan, which required EX-IM to issue a Letter of Credit identifying how Sun Land could disburse the funds. EX-IM did not even issue the Letter of Credit until April 2006, and the Final Disbursement Date was not adjusted until August 2006 and again in March 2007. Based on the facts in the record, funds were available for the Azua II project for only a five-month period from May 2007 to October 2007. Yet, AIS continued working on the project from March 2004 until mid-2007 while funds were not available and did not cease construction on the project until August 2008. AIS's continued performance suggests that the Parties did not believe the financing delays were substantial or cause for concern. AIS's argument positing now that only the third financing delay—which AIS attempts to lay exclusively at the feet of the Dominican Republic—caused the financial collapse of the Azua II project is not persuasive.

Given that "[c]lear error is a highly deferential standard of review" and the "district court's account of the evidence is

plausible in the light of the record viewed in its entirety," we cannot say that the district court clearly erred in finding that the Dominican Republic was not responsible for the Azua II project's financing delays, and we cannot reverse. *Morrissette-Brown*, 506 F.3d at 1319 (second quote quoting *Anderson*, 470 U.S. at 573–74).

**2. The District Court's Finding that the Dominican Republic Complied with Its Obligations under the Contract Is Supported by Substantial Evidence.**

In the district court's findings of fact, it concluded that the Dominican Republic had fulfilled its obligations pursuant to the contract by submitting approvals for work performed by AIS in compliance with the Credit Agreement, and therefore did not breach the contract. Appellant contends that this finding was clear error, because, according to AIS, the Dominican Republic's then-President, Leonel Fernandez, ordered INDRHI to terminate the contract for political reasons.

In support of this contention, Appellant highlights the following five pieces of evidence that Appellant claims were unrebutted: (1) a conversation AIS's President, Julio Morales Perez, had with then-President Fernandez of the Dominican Republic in March 2009, in which President Fernandez allegedly stated he did not like Sun Land and that "under these conditions, the Dominican State will not continue the work"; (2) the testimony of Sun Land's principal, Daniel Mejia, that President Fernandez "made the decision [to] cancel[ ] the transaction anyway[s]"; (3) the President of the Florida Export Finance Corporation, Steve Fancher's, opinion that the President of the Dominican Republic killed the deal for

political reasons; (4) a University of Utah Memorandum stating that the Dominican Republic froze the project in December 2008; and (5) the fact that the Dominican Republic later awarded the Azua II contract to CQG. It is Appellant's position that since this evidence was uncontested, the district court must have ignored it and therefore committed clear error.

Appellant's argument that the district court "ignored" the evidence is demonstratively false. The district court considered this evidence twice, directly addressing it in its Findings of Fact as well as in its Order on Appellant's Motion for Reconsideration. In the district court's findings of fact, it concluded that some of the evidence Appellant now cites was hearsay and "insufficient to support [the] finding that the Dominican Republic breached the Contract." While the district court later admitted and considered Julio Morales Perez's testimony, Stephen Fancher's testimony, and the Utah State University memorandum, as non-hearsay on Appellant's Motion for Reconsideration, the district court still determined that Appellant's evidence was insufficient to establish that the Dominican Republic had breached the contract when considered by the district court in its analysis.

Furthermore, upon examination of the evidence AIS cites in context, we cannot say that the district court's decision not to credit or give considerable weight to that evidence was inappropriate. For example, the district court's decision not to credit the testimony of Sun Land's principal, Daniel Mejia, that President Fernandez "made the decision [to] cancel[ ] the transaction anyway[s]"

was appropriate, because that testimony pertained to an entirely different and separate project within the Dominican Republic that Sun Land had financed. The district court's decision not to credit or give great weight to AIS's President Julio Morales Perez's testimony, that President Fernandez stated in March 2009 that he did not like Sun Land and that "under these conditions, the Dominican State will not continue the work", was appropriate because the contract had already been terminated by INDRHI months before. The University of Utah Memorandum suffers from the same defect because it was written months after the fact, and AIS had already ceased construction in August 2008, months before the Dominican Republic allegedly "froze" the Azua II project in December 2008. Furthermore, the fact that the Dominican Republic awarded a contract for Azua to CQG is not evidence that the Dominican Republic's president terminated the former contract, because the CQG contract was entered into years after the contract with AIS had been terminated. Finally, Steven Fancher provided no testimony that would support his opinion that President Fernandez killed the deal for political reasons. As such, even if it was in fact unrebutted, as Appellant contends, the district court did not need to credit or give weight to this evidence as it was not otherwise supported and there was other substantial evidence to support the trial court's finding. *See Hearn v. McKay*, 603 F.3d 897, 904 (11th Cir. 2010) ("It is the exclusive province of the judge in non-jury trials to assess the credibility of witnesses and to assign weight to their testimony." (citation, brackets, and quotation marks omitted)); *United States v. Brown*, 415 F.3d 1257, 1270 (11th Cir. 2005) ("Questions

20-14058                Opinion of the Court                27

about the weight given to testimony, as distinguished from the issue of its admissibility, are for the factfinder.")

In addition, the district court's finding that the Dominican Republic did not breach the contract because it fulfilled its obligations pursuant to the contract is supported by substantial evidence. That evidence centered on how the Third Amendment to the Credit Agreement was presented to then-President Leonel Fernandez for formal submission to the Dominican Republic Congress on September 30, 2008, as well as the fact that the Dominican Republic approved payment of all AIS's work invoices. While it is unclear whether the Third Amendment to the Credit Agreement was ever formally submitted to the Dominican Republic Congress, as stated *supra*, congressional ratification became a moot issue after Sun-Trust withdrew from Azua II. Also, as noted, the district court viewed the action of the Parties regarding financing and extensions through the contract's termination.

As such, given that the district court was in the best place to judge the witnesses' credibility, and the district court's account of the evidence is plausible in light of the record viewed in its entirety, the district court's finding that the Dominican Republic did not breach the contract is not clearly erroneous. *Morrissette-Brown*, 506 F.3d at 1319.

## C. The District Court's Determination of Damages Is Supported by Substantial Evidence.

Finally, Appellant contends that the district court committed clear error and abused its discretion when it only awarded

Appellant $576,842.00 in damages for lost profits.  Appellant contends that the district court committed clear error and abused its discretion for the following three (3) reasons.  First, the district court abused its discretion by ignoring proper methods of calculating lost profits.  Second, the district court committed clear error by ignoring evidence of AIS's delay damages.  Finally, the district court abused its discretion by refusing to award AIS damages from INDRHI for unpaid invoices.

AIS's three (3) reasons once again mistake the actual issues presently on appeal, which are: (1) whether the district court's damages determinations are supported by substantial evidence and correct application of law as to damages; and (2) whether the district court correctly interpreted the contract when it declined to award AIS damages for unpaid invoices.

The district court's damages determinations are supported because AIS presented wholly inadequate evidentiary support for its claims of lost profits and alleged delay damages.  Therefore, the district court's decision to credit Appellees' damages expert was appropriate.  The district court also correctly interpreted the contract as it pertained to who was responsible for AIS's unpaid invoices.

### 1. The District Court's Damages Determinations Are Supported by Substantial Evidence.

Under Florida law, "evidence as to the amount of damages cannot be based on speculation or conjecture, but must be proven with certainty." *Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1222 (11th Cir. 2018) (citation and

quotation marks omitted).  In this case, Appellant did not establish with certainty its lost profit damages or delay damages.  In contrast, Appellees presented evidence that supported their determination of lost profits and delay damages.  As such, even though there are two permissible views of the evidence in this case, given that only one view of the evidence was sufficiently supported, the district court's choice to credit Appellee's expert cannot be clearly erroneous.  *Morrissette-Brown*, 506 F.3d at 1319.

### a. The District Court Did Not Err in its Lost Profits Findings of Fact.

There are "two generally recognized methods of proving lost profits: (1) the before and after theory and (2) the yardstick test." *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1538 (11th Cir. 1985) (quoting *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974)).  The before and after theory compares a plaintiff's profits recorded prior to the breach (or statutory violation as was the case in *G.M. Brod*) with those after the breach or anticipated profits. *Id*.  Both Parties here purported to employ this method for determining Appellant's lost profit damages.

To establish its lost profits and delay damages, AIS relied upon the testimony of Mr. Ben Nolan, an engineering, construction, and project management expert.  Mr. Nolan conceded that it was "pretty likely" that in calculating AIS's lost profits, he and his employee, Mr. Solomon, a certified public accountant, who did not provide testimony or sit for a deposition, had only actually considered one financial document— AIS's 2007 financial statement prepared by Rosillo & Associates.  Mr. Nolan and his employee only

relied upon that one document because AIS did not produce any general ledgers, cost/payroll reports, evidence of purchase orders, invoices, payments, or any other supporting transactional documents during discovery, and therefore, Mr. Nolan was "always looking for more documents."

In contrast, Appellees' expert, Mr. Daniel Hughes, was a certified public accountant who calculated damages utilizing the before and after theory. Unlike Mr. Nolan, Mr. Hughes also relied upon AIS's 2006 financial statement, which Mr. Nolan had omitted from his report when calculating AIS's damages. This resulted in Mr. Hughes estimating that AIS's total profit, had the project been completed on schedule, would have been $3,229,600.00, after comparing AIS's operating expenses with its gross profit in 2006 and 2007. Mr. Hughes was then able to utilize the "benefit of the bargain" approach to calculate AIS's lost profits based on what the Parties anticipated, and he calculated those lost profits through 2008 to be $576,842.00.

Mr. Hughes was also utilized to impeach the testimony of Mr. Nolan and testified that Mr. Nolan's calculations had not followed the general standards of the accounting profession, specifically in regard to management representation. Mr. Nolan's calculations had not followed the standards of the accounting profession, because Mr. Nolan's assumptions about damages, which were based on management representation, were not independently validated, or confirmed to be true and accurate or sufficiently supported by the record evidence.

As such, we cannot find that the district court committed clear error in deciding to credit Appellees' expert over Appellant's, when determining damages, specifically lost profits, where both Parties purported to use the same accounting method. The district court did not err, because AIS failed to provide evidence from which the amount of its lost profit damages could be reasonably and reliably ascertained. The district court found Appellees' calculations should be accepted, and substantial evidence supports its finding.

### b. The District Court Did Not Err in its Delay Damages Findings of Fact.

Appellant next contends that the district court committed clear error when it declined to award AIS delay damages. Appellant contends that it is entitled to delay damages because Appellees delayed the construction under the contract and because of that delay, Appellant's operating costs increased.

The district court declined to award AIS delay damages, because AIS failed to provide evidence of a sustained loss attributable to INDRHI's delay and any additional expense incurred because of the delay was already included in the invoices that had been submitted to INDRHI for approval. Accordingly, the district court concluded that these additional operating costs had already been factored into the invoices submitted by AIS and that neither AIS nor Sun Land was entitled to delay damages from INDRHI or the Dominican Republic.

Appellant contends that the district court erred because Appellant now claims that it presented competent evidence that AIS suffered $1,880,268.00 in delay damages resulting from INDRHI's breach of contract. Appellant's argument fails, however, because upon review of the record in its entirety, we note that AIS never presented documentary evidence of delay damages in the amount of $1,880,268.00 to the district court. Rather, AIS now attempts to recharacterize damages that were denied for "work performed" as delay damages.

As such, the district court did not clearly err when it determined that AIS was not entitled to delay damages, because it found that any delay damages were accounted for in the approved work invoices. Appellant presents no separate support for delay damages apart from its unpaid work reports.

**2. The District Court Did Not Abuse Its Discretion When It Found that Sun Land Was Responsible for AIS's Unpaid Invoices.**

Finally, Appellant contends that the district court abused its discretion when it concluded that payment on unpaid work invoices was the responsibility of Sun Land, not Appellees. Appellant contends that the district court abused its discretion because it acknowledged that AIS had not been paid for certain work invoices, but then declined to order INDRHI or the Dominican Republic to pay AIS.

The district court declined to order Appellees to pay AIS, because Sun Land had already received funds to cover those expenses

from SunTrust but failed to remit them to AIS. We note that Appellant's expert similarly concluded that "Sun Land and AIS have Excess Funds" and that the "[Appellees] owe $0 to AIS for Unpaid Invoices." Despite the district court agreeing with its own expert's conclusions, Appellant contends that the district court abused its discretion by not ordering Appellees to pay AIS for the work invoices. As this issue turns upon the interpretation of the contract, the standard of review is *de novo. HGI Assocs., Inc.*, 427 F.3d at 873.

Appellant contends that under the terms of the Purchase Agreement, the Dominican Republic had the contractual obligation to pay for the work, not Sun Land. Appellant's argument fails because the Purchase Agreement and the Protocol together form the contract that is at the center of this dispute. When the Purchase Agreement and the Protocol are examined together, it is clear the responsibility for the unpaid invoices lies with Sun Land.

The responsibility for the unpaid invoices lies with Sun Land because, under the terms of the Protocol, INDRHI and the Dominican Republic were required to review AIS's invoices, and if approved, transmit them with the appropriate approval documents to Sun Land. Sun Land was then required to submit those approval documents to the lender, SunTrust. SunTrust was then required to disburse funds to Sun Land under the terms of the Purchase Agreement, and as stated *supra*, the funds could only be disbursed to Sun Land. Once Sun Land took that disbursement from SunTrust, Sun Land became obligated to pay AIS.

Given that evidence was presented that INDRHI had approved the work invoices for payment as well as directed Sun Land to pay AIS and that excess funds had already been disbursed to Sun Land, the district court did not abuse its discretion when it concluded that responsibility for the unpaid invoices lay with Sun Land, after INDRHI had approved them for payment and Sun Land received the funds meant to pay AIS's invoices from SunTrust.

## CONCLUSION

In conclusion: (A) substantial evidence supports the district court's findings of fact and conclusions of law that Appellant failed to overcome the FSIA's presumption that the Dominican Republic and INDRHI are separate entities, and thus, we conclude that the district court did not err in making this finding; (B) substantial evidence supports the district court's findings of fact that the Dominican Republic did not separately breach the contract itself, such findings are plausible in light of the record and thus, the district court did not clearly err in finding that the Dominican Republic was not liable to AIS for breach of contract; and (C) substantial evidence supports the district court's findings of fact and determinations of credibility of witnesses in calculating all damages owed to AIS and in determining that neither the Dominican Republic nor INDRHI is responsible for paying AIS's unpaid invoices and thus, the district court did not abuse its discretion in its determination of the amount of damages awarded to AIS. Accordingly, we **AFFIRM**.